[No. C027975. Third Dist. Dec. 15, 1998.]

ANNE LAIRD, Plaintiff and Appellant, v.
CAPITAL CITIES/ABC, INC., Defendant and Respondent.

**COUNSEL**

Stephan A. Mandell for Plaintiff and Appellant.

Littler Mendelson and Kenneth R. O'Brien for Defendant and Respondent.

**OPINION**

**SIMS, Acting P. J.**—Plaintiff Anne Laird was terminated from her sales position with the PennySaver, a publication owned by Sutton Industries, Inc. (Sutton). She sued defendant Capital Cities/ABC, Inc. (Cap Cities), Sutton's parent corporation, alleging employment discrimination and wrongful termination.[1] She did not name Sutton as a defendant.

Cap Cities moved for summary judgment on the ground that it was not Laird's employer. The trial court granted the motion and dismissed the complaint. Laird appeals. We shall affirm.

---

[1] The complaint alleged both sex discrimination and age discrimination. Cap Cities obtained summary adjudication as to age discrimination on the ground that Laird had not exhausted her administrative remedies with respect to that cause of action. Laird does not challenge that ruling on appeal.

Sandy Kleinke and Wes Smith, Laird's supervisors, were also named as defendants, but Laird later dismissed them with prejudice.

## Factual And Procedural Background

### The complaint.

Laird's complaint stated causes of action for sex discrimination, age discrimination, and wrongful termination in breach of an implied-in-fact contract of employment based on the following allegations: Defendant Cap Cities hired her in 1986 as an account sales representative at its Sacramento office, where she was a top producer. However, after a promotion in 1992 to the national accounts department, things went wrong. Male counterparts in the department were favored over her, causing her to lose accounts and income. When she complained to defendants Sandy Kleinke (described as Cap Cities' sales manager) and Wes Smith (described as Cap Cities' general manager), they not only rebuffed her but exacerbated the mistreatment. She called Bill Carman, president of Sutton, who knew her and her work; Carman promised to take care of the problem. (The complaint describes Sutton only as a subsidiary of Cap Cities. It states no facts to show why Carman would have known Laird's work or how he could have taken care of her problem.) On learning of her contact with Carman, Smith threatened to terminate her if she ever spoke to Carman again. Later, she did speak to him again; Smith saw her doing so. From then on, Smith and Kleinke constantly harassed her and interfered with her accounts. Ultimately, in April 1994, when she was 41 years old, they terminated her for alleged poor performance. She was replaced by a person many years younger.

### The motion for summary judgment.

Defendant Cap Cities moved for summary judgment on the ground that it was not liable for any acts or omissions of Sutton, its corporate subsidiary, as to Laird. In its separate statement of undisputed facts it asserted as follows, citing to the declarations of Sutton President Carman and Cap Cities Vice-president Jeffrey Rosen and to Laird's deposition:

Laird began employment with Sutton, doing business as the PennySaver, in 1986. Sutton is a separate corporation from Cap Cities, maintaining separate offices, facilities, human resources professionals, accounting, financial staff, and boards of directors from Cap Cities. As a subsidiary, Sutton reports its financial results to Cap Cities. However, Sutton is managed and operated solely by persons working for Sutton. It has a work force separate from Cap Cities. It has its own human resources department.

Cap Cities and Sutton maintain separate payroll records for their respective employees, pay federal and state employment taxes separately, process

their payrolls and deduct payroll taxes separately, separately issue W-2's, and have separate federal tax identification numbers. Cap Cities and Sutton maintain separate records relating to disbursements and issue separate 1099's to their respective independent contractors, vendors, and suppliers.

Sutton alone makes all decisions regarding the hiring and work assignments of its employees. Cap Cities does not exercise day-to-day control over Sutton's employees. When Sutton's president approved Laird's termination, he did not seek the advice of anyone at Cap Cities or even inform anyone there of the decision, which was made solely by Sutton managers.

Laird was an employee of Sutton at all relevant times, having gained employment by filling out an application for employment with Sutton. Each of the employee handbooks in effect during her tenure was issued by Sutton. Laird was never employed by Cap Cities and had no contract of employment with Cap Cities. Her employment records reflect that she was employed by Sutton. Her paychecks and W-2's were issued by Sutton. She did not report to anyone at Cap Cities. When she had to name her employer on a form for medical treatment, she named Sutton. When she applied elsewhere for employment after her termination, she named her former employer as Sutton on her employment application.

Sutton President Carman directly or indirectly supervises all Sutton employees. Carman reports to Wes Turner, vice-president and general manager of the Kansas City Star, who in turn reports to a manager at Cap Cities with regard to his supervision of Sutton.

Defendants Kleinke and Smith, like Carman, worked for Sutton.

*Laird's opposition.*

Laird contended that triable issues of material fact existed as to Cap Cities' liability because it "established itself as" her employer, because Sutton acted as its agent, and because, having held itself out as her employer, it was estopped to deny this relationship.

In Laird's separate statement, which cited only to her own declaration, she admitted that she began employment with Sutton (doing business as the PennySaver) in 1986, her W-2's came from Sutton, and her medical plan was in Sutton's name. However, she asserted that Sutton was wholly owned and operated by Cap Cities and that she was a Cap Cities employee or dual employee. She denied that Sutton issued her paychecks, stating that she was not sure who issued them. She similarly "denied" almost all the remaining

facts alleged by Cap Cities as to Sutton's independence of Cap Cities' control, in almost every case citing generally to two or more paragraphs of her declaration.

*Cap Cities' evidentiary objections.*

Along with its reply, Cap Cities filed evidentiary objections to almost every part of Laird's declaration. It objected to paragraphs 2 through 4 of the declaration on grounds including immateriality, lack of foundation, and hearsay; it objected to paragraphs 5 through 7 as contradictions of Laird's deposition testimony.[2]

---

[2] Paragraphs 2 through 4 stated: "2. I became employed with the Penny[S]aver in 1986 as a sales representative. The Penny[S]aver was operated by Sutton Industries. Sutton Industries was purchased by and formed a part of the Publications Division of Cap[] Cities since 1984. Attached hereto as Exhibit 1 is a true and correct copy of the 1990 Penny[S]aver Employee Handbook describing the Company History . . . . [¶] 3. I was individually informed by Defendants WES SMITH and SANDY KLEINKE, as well as in groups of employees, that Sutton was owned and a part of Cap[] Cities, and that we should proudly use Cap[] Cities['] name as our employer in connection with the Penny[S]aver to all of our customers. I was told along with peers to not use Sutton Industries['] name because Cap[] Cities held more clout. I did as ordered and informed all of my customer base that we were a Cap[] Cities company. I was always told that I was a Cap[] Cities employee. Please see [employee publications attached as exhibits]. [¶] 4. Cap[] Cities['] name and logo was placed on all of our Penny[S]aver correspondence, letterhead and documents. True and accurate copies of examples of the manner and extent to which Cap[] Cities held itself out as the owner of the Penny[S]aver are attached hereto . . . ."

Paragraphs 5 through 7 stated: "5. When I filed my DFEH [Department of Fair Employment and Housing] claim, I naturally used Cap[] Cities as my employer, pursuant to the direction given me by my superiors and the manner in which Cap[] Cities had held itself out to myself and my customers as the owner of the Penny[S]aver. I also listed the Penny[S]aver, since that was the subdivision I worked for. I attended employee sessions regarding investment in Cap[] Cities, and received a copy of their annual reports. At these sessions I, among others, was told we were part of the Cap[] Cities 'family.' [¶] 6. The Penny[S]aver held regular readership contests where someone could win $1,000 or more. These contests all had a disclaimer stating that Cap[] Cities employees were not eligible for the contest. I was told, along with my peers, that we were Cap[] Cities employees and were specifically not eligible for the contests. [¶] 7. I had a strong working relationship with Bill Carm[a]n for many years. I was told that his decisions were subject to review by Cap[] Cities."

Laird's separate statement cited paragraphs 5 through 7, along with one or more of the other paragraphs, in support of her denials of the following facts alleged by Cap Cities: Sutton is a separate corporation from Cap Cities with separate offices, facilities, human resources professionals, accounting, financial staff, and board of directors; Sutton as a subsidiary reports to Cap Cities with its financial results; Sutton is managed and operated solely by persons employed by Sutton; Sutton has a work force separate from Cap Cities and its own human resources department; Cap Cities and Sutton maintain separate payroll and tax records and issue separate tax statements; they maintain separate records of disbursements and issue separate 1099's; Sutton makes all employment decisions regarding its employees alone, and specifically did so in terminating Laird; Laird was an employee of Sutton alone at all times;

*The trial court's ruling.*

As relevant on appeal, the trial court ruled:

"The Motions for Summary Adjudication of the First (Sex Discrimination) and Third (Wrongful Termination) Causes of Action are GRANTED. Moving Defendant has moved for Summary Adjudication (and for Summary Judgment) on the ground that it was not Plaintiff's employer and cannot be liable to her for sex discrimination or wrongful termination. Defendant contends that Plaintiff's actual employer was Sutton Industries, its wholly owned subsidiary. Defendant contends that in order for it to be held liable Plaintiff must show that Sutton was a mere instrumentality of the parent corporation (i.e. an alter ego theory) or (following analogous federal Title VII authority) that defendant and Sutton are a single employer under NLRB standards. The controlling factors are (1) interrelation of operations; (2) common management; (3) common control of labor relations; and (4) common ownership or financial control. Defendant has produced evidence that: the corporations were independently managed; Sutton had its own personnel department; was solely responsible for hiring and work assignments; Plaintiff reported to other Sutton employees; she was paid, hired and fired by Sutton. This evidence is sufficient to shift the burden to Plaintiff to create a triable issue of material fact. Plaintiff relies upon evidence that: Plaintiff worked for the Penny[S]aver Magazine; Penny[S]aver advertised itself as a Capital Cities/ABC publication, and Penny[S]aver business was conducted on Capital Cities letterhead. Also, several of the documents set out policies that apply to employees of both Capital Cities and Sutton (though they clearly distinguish between the entities); and one shows Plaintiff was regarded as an eligible Capital Cities employee for purposes of participation in a Capital Cities Stock Option Plan. She has also produced evidence that employees were encouraged to use the Capital Cities name and to consider themselves part of the Capital Cities operation. There simply is no material issue of fact that requires trial. As an alternative ground for granting the motion, Plaintiff has asserted liability based on either an agency or estoppel theory. No evidence before the Court suggests triable issues of fact as to these alternative theories.

---

she filled out a job application with Sutton; her employee handbooks were issued by Sutton; she had no employment contract with Cap Cities; she did not report to anyone at Cap Cities; Bill Carman supervises all Sutton employees, reporting to a manager who in turn reports to a Cap Cities manager; Carman works for Sutton; Cap Cities exercises no day-to-day control over Sutton employees.

In Laird's deposition, she admitted among other things: DFEH's (Department of Fair Employment and Housing) case closure letter to her as to her employment discrimination claim did not mention Cap Cities; her paychecks were issued by Sutton ("I think so"); defendants Smith and Kleinke worked for Sutton; Bill Carman did also; and she reported to Smith and Kleinke, not to anyone at Cap Cities.

"In light of the rulings on the summary adjudications, the Motion for Summary Judgment is GRANTED.

"The objections to Plaintiff's declaration, where inconsistent with the deposition testimony, are sustained. Other than this specific ruling, the court has relied only on admissible evidence."

DISCUSSION

I

Summary judgment is properly granted to a defendant who shows without rebuttal that one or more essential elements of the plaintiff's cause of action cannot be separately established or that there is an affirmative defense which bars recovery. (Code Civ. Proc., § 437c, subds. (n), (o)(2).) Laird contends that she has established a triable issue of material fact as to whether Cap Cities was her employer under any of three tests: the "integrated enterprise" test, the agency test, and the alter ego test. In addition, she contends the evidence she has adduced shows that Cap Cities is equitably estopped to deny it is her employer. Laird is mistaken.

At the outset we must point out that both parties have failed to deal adequately with the trial court's rulings on Cap Cities' evidentiary objections. Laird ignores the subject altogether, silently continuing to rely on evidence to which Cap Cities successfully objected. Cap Cities appears to argue, contrary to the clear holding of our Supreme Court, that this court may rule on those of its objections which the trial court did not expressly sustain. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207].) ■ The trial court's statement that it had considered only admissible evidence was not an implied ruling sustaining unspecified evidentiary objections. On the contrary, *Ann M.* teaches that we must take this statement as an implied overruling of any objection not specifically sustained. Thus we must deem the substance of paragraphs 2 through 4 of Laird's declaration, as to which the trial court did not expressly rule, admissible and may not consider Cap Cities' renewed objections thereto.

On the other hand, the trial court properly sustained Cap Cities' objections to portions of plaintiff's declaration to the extent it contained factual averments that were inconsistent with her prior deposition testimony. (*Visueta* v. *General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1613 [286 Cal.Rptr. 402], and authorities cited therein.)

II

■ We first consider whether Laird has adduced evidence tending to show that Cap Cities was her employer under the "integrated enterprise" test.

■ Two corporations may be treated as a single employer for purposes of liability under title VII of the federal 1964 Civil Rights Act (42 U.S.C. § 2000e et seq.). (*Morgan* v. *Safeway Stores, Inc.* (9th Cir. 1989) 884 F.2d 1211, 1213.) Because California's Fair Employment and Housing Act (Gov. Code., § 12900 et seq.) (FEHA) has the same nature and purpose as the federal law, California courts frequently look to federal case law for guidance in interpreting the FEHA. (*Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1316-1317 [237 Cal.Rptr. 884].)

An employee who seeks to hold a parent corporation liable for the acts or omissions of its subsidiary on the theory that the two corporate entities constitute a single employer has a heavy burden to meet under both California and federal law. Corporate entities are presumed to have separate existences, and the corporate form will be disregarded only when the ends of justice require this result. (*Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 300 [216 Cal.Rptr. 443, 702 P.2d 601] [alter ego liability]; *Mid-Century Ins. Co.* v. *Gardner* (1992) 9 Cal.App.4th 1205, 1212 [11 Cal.Rptr.2d 918] [same].) In particular, there is a strong presumption that a parent company is not the employer of its subsidiary's employees. (*Frank* v. *U.S. West, Inc.* (10th Cir. 1993) 3 F.3d 1357, 1362.)

■ The federal courts have developed a test, derived from federal labor case law, to determine whether two corporations should be considered a single employer for title VII purposes. Commonly called the "integrated enterprise" test, it has four factors: interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control.[3] (*Schweitzer* v. *Advanced Telemarketing Corp.* (5th Cir. 1997) 104 F.3d 761, 764; *Frank* v. *U.S. West, Inc., supra,* 3 F.3d at p. 1362;

---

[3]Contrary to Cap Cities' apparent position, the California courts have not independently promulgated an "integrated enterprise" test. Cap Cities begins its discussion of this topic by citing *Institute of Veterinary Pathology, Inc.* v. *California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111 [172 Cal.Rptr. 74] as "controlling California law" and chides Laird for failing to mention it. However, the passages from this decision which Cap Cities quotes all appear in the decision under the heading "Alter Ego" (*id.* at pp. 119-120); the term "integrated enterprise" is not used anywhere in the decision. The other California decisions Cap Cities cites in this part of its appellate brief likewise discuss tests other than the "integrated enterprise" test. (*Mesler* v. *Bragg Management Co., supra,* 39 Cal.3d 290; *Mid-Century Ins. Co.* v. *Gardner, supra,* 9 Cal.App.4th 1205; *Associated Vendors, Inc.* v. *Oakland Meat Co.*

*Morgan* v. *Safeway Stores, Inc., supra,* 884 F.2d at p. 1213; *McKenzie* v. *Davenport-Harris Funeral Home* (11th Cir. 1987) 834 F.2d 930, 933; *Childs* v. *Local 18, Intern. Broth. of Elec. Wkrs.* (9th Cir. 1983) 719 F.2d 1379, 1382; *York* v. *Tennessee Crushed Stone Ass'n* (6th Cir. 1982) 684 F.2d 360, 362; *Mas Marques* v. *Digital Equipment Corp.* (1st Cir. 1980) 637 F.2d 24, 27; *Williams* v. *Evangelical Retirement Homes* (8th Cir. 1979) 594 F.2d 701, 703; *Baker* v. *Stuart Broadcasting Co.* (8th Cir. 1977) 560 F.2d 389, 391-392.) This test is designed to further Congress's intent that title VII be construed liberally, including its definition of the term "employer." (*Baker* v. *Stuart Broadcasting Co., supra,* 560 F.2d at pp. 391-392.)

Under this test, common ownership or control alone is never enough to establish parent liability. (*Frank* v. *U.S. West, Inc., supra,* 3 F.3d at p. 1364.) Although courts consider the four factors together, they often deem centralized control of labor relations the most important. (*Schweitzer* v. *Advanced Telemarketing Corp., supra,* 104 F.3d at p. 764; *Trevino* v. *Celanese Corp.* (5th Cir. 1983) 701 F.2d 397, 404; see *Frank* v. *U.S. West, Inc., supra,* 3 F.3d at p. 1363.) "The critical question is, '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?' [Citation.] A parent's broad general policy statements regarding employment matters are not enough to satisfy this prong. [Citation.] To satisfy the control prong, a parent must control the day-to-day employment decisions of the subsidiary. [Citations.]" (*Frank* v. *U.S. West, Inc., supra,* 3 F.3d at p. 1363.)

To make a sufficient showing of "interrelation of operations" on summary judgment, the plaintiff must do more than merely show that officers of the subsidiary report to the parent corporation or that the parent benefits from the subsidiary's work. Since these facts exist in every parent-subsidiary situation, such a showing would create a triable issue of material fact in every case. What the plaintiff must show, rather, is that the parent has exercised control "to a degree that exceeds the control normally exercised by a parent corporation." (*Frank* v. *U.S. West, Inc., supra,* 3 F.3d at p. 1362.)

 In this case, considering all the evidence adduced on summary judgment—including that adduced by Laird as to which Cap Cities' objections were not sustained—Laird's showing is insufficient to raise a triable issue of fact under the integrated enterprise test.

First and most important, Laird produced no evidence that Cap Cities exercised day-to-day control over Sutton's employment decisions in general

(1962) 210 Cal.App.2d 825 [26 Cal.Rptr. 806].) We conclude that Laird is correct in her implied representation that there is no California case law on the "integrated enterprise" test.

or that it exercised any control over Sutton's decisions with respect to her. Cap Cities' showing that Sutton maintains separate control over its employment decisions is essentially undisputed. All the paperwork Laird filled out on which she applied for employment or on which she was required to designate her present or past employer named Sutton, not Cap Cities. Her employee handbooks, though mentioning Cap Cities from time to time, clearly identified her employer as Sutton. Laird admitted at her deposition that Sutton provided her W-2's (though she later tried improperly to controvert this point in her declaration). Laird also admitted at her deposition that the supervisors who fired her were employees of Sutton, as was its president, Carman, who approved the decision. Although Carman stated in his declaration that he reports to a manager who reports in turn to Cap Cities management, he did not state that he reports on employment decisions, and Laird produced no admissible evidence that he does.[4] Laird's showing that Sutton employees were instructed to hold themselves out to the public as Cap Cities employees, that Cap Cities made Sutton's employees eligible for certain Cap Cities benefits, and that Cap Cities deemed Sutton employees to come within its general equal opportunity policy is insufficient as to this prong of the integrated enterprise test. (See *Frank* v. *U.S. West, Inc., supra,* 3 F.3d at p. 1363 [parent's "broad, general policies" and administration of Employee Retirement Income Security Act of 1974 (ERISA) plan for subsidiary not proof of control over subsidiary's employment practices].) Her bare assertion that she "was always told that [she] was a Cap[] Cities employee," even though we must deem it admissible (since it occurs in a paragraph of her declaration as to which the trial court did not rule on Cap Cities' evidentiary objection), likewise fails to establish any involvement of Cap Cities in Sutton's employment decisions.

Laird also produced no evidence that the operations of Cap Cities and Sutton were "interrelated"—i.e., that Cap Cities exercised greater control over Sutton's operations than that which a parent corporation would normally exercise over its subsidiary. (*Frank* v. *U.S. West, Inc., supra,* 3 F.3d at p. 1363.) She did not show, for instance, that Cap Cities kept Sutton's books, issued its paychecks, or paid its bills. Nor did she show that the two operations had shared employees (in the sense that any employee of one might be reassigned to the other), headquarters, or office space. (*Ibid.*) The fact that Cap Cities maintained pension plans and other benefits for Sutton employees, without more, is insufficient to create a triable issue of fact as to the interrelation of operations of the two corporations. (See *Sobelman* v.

---

[4] In asserting "CARMAN told her that his decisions were reviewed by CAP CITIES," Laird cites to the portion of her declaration which the trial court properly ruled inadmissible. But even if this evidence were admissible it would not show that the "decisions" at issue include employment decisions.

*Commerce Bancshares, Inc.* (E.D.Mo. 1977) 444 F.Supp. 84, 85.) Laird did show that Cap Cities claimed credit in the public eye for Sutton's operations and that Sutton's managers instructed their employees to use the Cap Cities name in dealing with the public because it "held more clout," but these facts do not tend to demonstrate that Cap Cities played any part in running Sutton's day-to-day business.

As already indicated, Laird also failed to show that the two corporations had any degree of common management. Other than her bare assertion that all Sutton employees were ipso facto Cap Cities employees, she offered no evidence that anyone served as a manager of both corporations. She identified no instance in which any Cap Cities manager made or influenced any day-to-day Sutton managerial decision. Nor did she show that any manager from either corporation was ever transferred to the other.

Finally, the mere fact of common ownership and financial control by Cap Cities, which it has never denied, is insufficient without more. (*Frank* v. *U.S. West, Inc., supra*, 3 F.3d at p. 1364.)

Laird relies heavily on two federal district court decisions. They do not support her.

In *Howry* v. *Nisus, Inc.* (M.D.Fla. 1995) 910 F.Supp. 576 the court held only that the plaintiff, who alleged that the parent corporation controlled its subsidiary's employment decisions through the parent's human relations department, had pleaded sufficient facts to survive a motion to dismiss for failure to state a claim. (*Id.* at p. 580.) Here it is Laird's evidentiary showing which we must assess, not merely the allegations of her complaint. As we have recounted, her evidence fails to contradict Cap Cities' showing that it did not control Sutton's employment decisions.

In *Eichenwald* v. *Krigel's, Inc.* (D.Kan. 1995) 908 F.Supp. 1531 the court found after trial that the closely held parent corporation owned all the stock of its subsidiaries (a small chain of jewelry stores), that the parent and the subsidiaries had the same officers, used a common advertising scheme, had a joint payroll, had common wages and benefits, and had a single personnel department located at the parent's corporate headquarters. All decisions regarding these matters were made at corporate headquarters. Customers could obtain and use charge cards for all the stores at any of them. Employees and merchandise were freely transferred between stores. All employees signed employment agreements indicating that the parent, not any individual

store, was their employer. Most prospective employees were interviewed at the parent's corporate headquarters. The IRS required the parent and the subsidiaries to file a consolidated tax return. Someone at corporate headquarters bought all the stores' inventory. (*Id.* at p. 1558.) In light of all these facts, the court held the parent liable for the tortious conduct of its subsidiaries' managers under the integrated enterprise test. (*Id.* at pp. 1558-1559.) The court had no occasion to decide whether a factual showing less overwhelming than this would have sufficed for liability. In the present case, practically all the factors the *Eichenwald* court relied on are missing. (At most Laird has made some showing as to a common advertising scheme and a common benefits plan.) Thus *Eichenwald* is inapposite.

For all the above reasons, the trial court was correct to find that Laird had not shown a triable issue of fact under the integrated enterprise test.

## III

Laird also contends that there is a triable issue of fact as to Cap Cities' liability on the theory that Sutton was Cap Cities' agent. We disagree.

Under both California and federal law, an "employer" includes any agent of an employer. (42 U.S.C. § 2000e(b); Gov. Code, § 12926, subd. (d).) An agent, under California law, is "one who represents another, called the principal, in dealings with third persons." (Civ. Code, § 2295.)

However, to establish a parent corporation's liability for acts or omissions of its subsidiary on an agency theory, a plaintiff must show more than mere representation of the parent by the subsidiary in dealings with third persons. The showing required is that "a parent corporation *so controls the subsidiary* as to cause the subsidiary to become *merely* the agent or instrumentality of the parent[.]" (*Linskey* v. *Heidelberg Eastern, Inc.* (E.D.N.Y. 1979) 470 F.Supp. 1181, 1184, italics added; see *E.E.O.C.* v. *Upjohn Corp.* (N.D.Ga. 1977) 445 F.Supp. 635, 639.) On this record, which we have discussed above, there is no showing that Cap Cities exercised any control over Sutton's employment decisions. To the contrary, the undisputed evidence showed that Sutton conducted its own employment decisions free of control by Cap Cities. Sutton is not Cap Cities' agent.

## IV

Laird further contends that there is a triable issue of material fact as to Cap Cities' liability on the theory that Sutton was Cap Cities' alter ego. Again, we disagree.

To justify piercing the corporate veil on an alter ego theory in order to hold a parent corporation liable for the acts or omissions of its subsidiary, a plaintiff must show that there is such a unity of interest and ownership between the two corporations that their separate personalities no longer exist, and that an inequitable result would follow if the parent were not held liable. (*Mesler* v. *Bragg Management Co., supra,* 39 Cal.3d at p. 300.) To put it in other terms, the plaintiff must show "specific manipulative conduct" by the parent toward the subsidiary which "relegate[s] the latter to the status of merely an instrumentality, agency, conduit or adjunct of the former . . . ." (*Institute of Veterinary Pathology, Inc.* v. *California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111, 119-120 [172 Cal.Rptr. 74].)

Laird relies for her claim of alter ego on the showing which we have already found insufficient to meet the less exacting integrated enterprise test. Her evidentiary showing therefore necessarily fails to meet the alter ego test.

Laird asserts in addition that failing to treat Sutton as Cap Cities' alter ego will produce an inequitable result because she will lose her lawsuit. While this is certainly the result that follows, there is nothing inequitable about it. Rather, it is the inevitable consequence of Laird's decision not to sue Sutton, her real employer. The truly inequitable result in this case would be to impose liability on a defendant who has none as a matter of law.

## V

Finally, Laird contends that Cap Cities is equitably estopped to deny it is her employer because it held itself out as such to her and to the world at large. We are not persuaded.

Equitable estoppel requires: (1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must intend that its conduct be relied on, or must so act that the party asserting estoppel had a right to believe it was so intended; (3) the party asserting estoppel must be ignorant of the true state of facts; and (4) the party asserting estoppel must rely upon the conduct to his injury. (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].) There can be no estoppel where one of these elements is missing. (*Green* v. *Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 556 [230 Cal.Rptr. 13].)

Here, the undisputed evidence established that Laird applied for employment with Sutton, received her paycheck from Sutton, reported only to

Sutton employees, and personally named Sutton as her employer on medical and employment applications. Thus, she cannot reasonably claim ignorance of the fact that Sutton was her employer. Her claim of estoppel therefore fails.

## DISPOSITION

The judgment is affirmed. Cap Cities shall receive its costs on appeal.

Scotland, J., and Callahan, J., concurred.